[No. 34662. Department Two. February 5, 1959.]

MARION TRUEAX et al., Appellants, v. FOUNTAIN BLACK et al., Respondents.[1]

V. E. Billow, Cahill & Woolson, Cameron Sherwood, and William M. Tugman, for appellants.

Judd D. Kimball and Dyar & Hubbard, for respondents.

DONWORTH, J.—This action was brought to determine the ownership of an eighty-acre tract of farm land in Columbia

[1] Reported in 335 P. (2d) 52.

county. The contending parties all claim ownership under the last will and testament of Henry Black which was duly executed on March 3, 1900.

The cause was tried by the court on an agreed stipulation of facts and resulted in a decree that the property was owned by respondent Lulu L. Singerman, who is the adopted daughter of Ida May Black, the life tenant named by the testator in his will. The remaindermen, or successors in interest of the remaindermen, named in the will, have appealed to this court.

The findings of fact upon which the decree is based are as follows:

"I.   On March 3, 1900, Henry Black executed his Last Will and Testament. Mary A. E. Black, wife of said Henry Black, died intestate on January 6, 1902. Henry Black died on October 24, 1904, and Daniel Black and Ida May Black, son and daughter of decedent, were appointed co-executors and the will was admitted to probate December 24, 1904. Another son, James Black, applied for letters of administration of his mother's estate and his application was refused on January 30, 1905. The Mary A. E. Black and Henry Black estates were probated together by said co-executors according to law.

"II.   Henry Black devised unto Ida May Black, his daughter, the following described real estate, which he stated was his separate property, situate in Columbia County, State of Washington, to-wit:   . . .   [Description of two eighty-acre tracts omitted.] for the term of her natural life, and at her death the remainder to her children, and in case she should die without children living, or the issue of any child or children living, the said remainder should go to his heirs named in the residuary clause of his will, as follows:

"Fountain Black [son]          Daniel Black [son]
Sarah McDonald [daughter]    James Black [son]
Anna Young [daughter]         Charles Black [son]
Marion Black [grandson]      John Black [grandson]
Ida May Black [daughter]

to be divided equally between them, share and share alike. The persons named in the residuary clause were the testator's sons and daughters except Marion Black and John Black, who were grandsons.

"III.   A dispute arose during the probate between Ida May and the remaindermen and this dispute was settled

by the remaindermen quit-claiming their interest to Ida May in the following described property situate in Columbia County: . . . [Description of the eighty-acre tract involved in this case omitted.] for the term of her natural life, and that the Court in distributing the said estates should distribute to Ida May the said lands last above described the same as though said lands were all that were devised to Ida May under Henry Black's will.

"The balance of the real estate was distributed as if Henry Black had died intestate thereto, and as if said lands had been the community property of Henry and Mary A. E. Black. Thereafter Ida May signed a document entitled 'Relinquishment' on April 30, 1906, which set forth the terms of the settlement agreement.

"Daniel Black and Ida May Black, co-executors, filed separate Final Reports and a Decree of Distribution was entered in the above-entitled court on September 4, 1906.

"IV. The Decree distributed the property in dispute to Ida May Black, for her natural life, *with remainder to her children or deceased child or children's children, if any such survive her, and if none survive her then the remainder to go to the grantors in the Quit Claim Deeds hereinabove mentioned.*

"After the Decree of Distribution was entered and the estates were closed, Ida May Black on September 26, 1906, being an unmarried person at the time, adopted Lulu Leora Young, her niece, who was the daughter of Anna Young, one of the remaindermen named in the will. Ida May died January 20, 1955 without having any natural child born to her although she married sometime after the adoption of Lulu Leora Young, and at her death was Ida May Black Stonecipher.

"V. That defendants, Arlie Fullerton and Katherine Fullerton are and have been for some years in actual possession of the lands involved in this action, farming same pursuant to the provisions of a written Lease entered into with said Lulu L. Singerman." (Italics ours.)

Appellants assign error to the entry of the trial court's three conclusions of law and its refusal to adopt two findings of fact and nine conclusions of law proposed by appellants.

At the time the will was drawn, the testator had a family consisting of his wife, four sons, three daughters, and several grandchildren. Respondent Lulu Singerman was a

granddaughter of the age of nine years at that time. Her mother, Anna Young, was one of the testator's married daughters. Ida May Black, another daughter of the testator, was then about thirty-two years old and unmarried.

Having these objects of his bounty in mind, Mr. Black declared in his will that the two eighty-acre tracts described therein were his separate properties, and disposed of them as follows:

"I give, devise and bequeath the following described real estate situate in Columbia County, State of Washington, the same being my separate property and estate, to-wit: . . . [property description omitted] to my daughter Ida May Black, for the term of her natural life, and at her death the remainder to her children, and in case she shall die without children living, or the issue of any child or children living, the said remainder shall go to my heirs hereinafter named."

The heirs referred to in the above quoted paragraph of the will as "hereinafter named" consisted of testator's wife, four sons, three daughters, and two grandsons. They, as contingent remaindermen, were to take the two tracts under the will, share and share alike, *in the event that* the life tenant, Ida May Black, should die "without children living, or the issue of any child or children living."

Henry Black died October 24, 1904. Between the time of making his will and his death, the only material change in the circumstances of the ten heirs named in the will (so far as the record shows) was the death of his wife intestate on January 6, 1902. Thus, there were only nine contingent remaindermen who survived Mr. Black.

The events which transpired subsequent to Henry Black's death relating to the joint administration of his and his wife's estate and the settlement of a dispute among the heirs as to the nature of the real estate (whether community property or Mr. Black's separate property) are set forth in findings Nos. III and IV, quoted above.

For convenience in identifying the two parcels of real property described in Mr. Black's will, we shall refer to the parcel involved in this action as the eighty-acre tract in

section 35, and the other as the eighty-acre tract in section 34.

The event which gives rise to this lawsuit is the adoption in 1906 (twenty-two days after the entry of the decree of distribution) of respondent Lulu L. Singerman by the life tenant, Ida May Black, then still unmarried. Subsequently, Ida May married one Stonecipher, and died January 20, 1955, without having any natural child born to her.

The crucial issue presented in this case is whether or not respondent Lulu L. Singerman, the adopted daughter of Ida May Black, is a "child" of the latter within the meaning of that term as used in Mr. Black's will. The answer depends on the intent of the testator when he executed his will and when he died.

In resolving that issue in the affirmative, the trial court, in its memorandum decision, followed what was referred to as the minority rule, to-wit, that, in determining the intent of the testator in the circumstances present in this case, it is necessary to take into consideration the statutes of adoption and the laws of descent. It was stated therein that, under the majority rule, the testator's intent is ascertained from an interpretation of the will without reference to the statutes regarding adoption and descent. The minority rule requires that the will be construed in the light of these statutes. The court based its conclusion (that in this state the minority rule is followed) upon its consideration of several decisions of this court presently to be noticed. Accordingly, the court entered its decree in favor of respondent.

The Washington cases referred to in the trial court's memorandum opinion are *In re Egley's Estate*, 16 Wn. (2d) 681, 134 P. (2d) 943, 145 A. L. R. 821 (1943), wherein we held that an adopted child has the same right of inheritance *from his adoptive parents* as a natural child; in *In re McCorkle's Estate*, 128 Wash. 556, 223 Pac. 1038 (1924), where a widow claimed an award under the then existing homestead statute, it was held that a surviving adopted daughter was "issue" within the meaning of the statute; in *In re Masterson's Estate*, 108 Wash. 307, 183 Pac. 93 (1919), an adopted daughter was held to be entitled to inherit from

her stepbrother, who had died intestate, just as though she had been his natural sister; in *Van Brocklin v. Wood*, 38 Wash. 384, 80 Pac. 530 (1905), we held that where an adoptive father failed to name or provide for his adopted daughter in his will, he is deemed to have died intestate as to her.

*In re Hebb's Estate*, 134 Wash. 424, 235 Pac. 974 (1925), appears to be closer on its facts to the present case. There, in his will, the testator failed to name or provide for the adopted son of his deceased son. This court held that the adopted son was a "descendant" of his adoptive father within the meaning of Rem. Comp. Stat., § 1402 (RCW 11.12.090) and that, under that statute, the testator had died intestate as to him. Referring to the adoption statute (Rem. Comp. Stat., § 1699; *cf.* RCW 26.32.140), we said:

"This statute has, on a number of occasions, been before this court, and the effect of the cases has been to give it a construction which places an adopted child in exactly the same position as a natural child so far as that is possible. In other words, to make the status the same as to all rights, privileges and obligations. . . ."

But there are several significant differences between the facts of the *Hebb's* case and those now before us. In the former, the adoption occurred prior to the execution of the will and the testator's death. In the present case, the adoption occurred *subsequent* to both of those events. Also, unlike the *Hebb's* case, respondent Singerman is not here claiming through her adoptive parent, but directly under the will of her adoptive grandparent.

It seems to us that all these cases are distinguishable from the one before us, because the former are concerned with statutes relating to adoption as bearing upon the adopted child's right to inherit under the intestacy laws or his being pretermitted in a will. Here, we are called upon to determine the meaning of the words "without children living, or the issue of any child or children living" (at the death of Ida May) in the context and under the circumstances that they were used by Henry Black when he signed his will.

Appellants, in the appendix to their brief, cite cases from twenty-six states in which they assert that the so-called

majority rule has been followed. Two leading decisions on this question appear to be very similar on their facts to the case at bar.

In *Puterbaugh's Estate*, 261 Pa. 235, 104 Atl. 601, 5 A. L. R. 1277 (1918), the testator bequeathed the residue of personal property in his estate to his executor with directions that he invest the same in securities and pay the interest and income therefrom to his son, during his natural life, and, upon his death, transfer the said estate absolutely to the son's "child or children and their heirs." Five years after the testator's death, his son adopted a daughter. The son died eighteen years later, leaving his widow and adopted daughter surviving him. The latter claimed the balance of the trust fund as against the residual legatees named in the will. In reversing the award to the adopted daughter, the Pennsylvania supreme court said:

". . . In this as in every other testamentary disposition which becomes the subject of judicial construction or interpretation, the first inquiry must be to ascertain if possible the intention of the testator as expressed in his will, which, once ascertained must be given effect. . . .

"The case calls for no discussion of the several statutes relating to the adoption of children; these are clearly not involved, for, however, construed they could reflect no light on the one pertinent inquiry which has regard to testator's intention. It is not a question of the right of an adopted child to inherit, but simply a question of the testator's intention with respect to those who are to share in his estate. We see nothing in the will or in the circumstances surrounding it indicating any intention on part of the testator to include in his bequest to the child or children of his son, . . . any but his immediate offspring."

The Georgia supreme court reached a similar result in *Comer v. Comer*, 195 Ga. 79, 23 S. E. (2d) 420, 144 A. L. R. 664 (1942), wherein a son, adopted by the testator's daughter fourteen years after the testator's death, sought to take as a "child" and/or "issue" of his adoptive mother who had died prior to the termination of a life estate created by the will. Concerning several terms employed by the testator to describe his intended remaindermen (*e.g.* "representatives

of children," "representatives of deceased children"), the court said:

"None of the language here quoted would, according to its natural import, include a person that was adopted as a child by one of the testator's children, where the adoption did not take place until after the testator's death. It would be unreasonable to say that he had any such adopted child in mind at the time of making his will, and it would require a clear addition to that instrument to include the plaintiff as one of the objects of his bounty. There being nothing in the will to the contrary, it is presumed that the testator intended that his property should go according to the law of natural descent, and not according to some artificial relation created by law. . . . [Citations.] Generally, the terms 'issue,' 'children,' 'heir,' and words of similar import, in a will, are intended to refer to natural or blood relationships, and would not include an adopted child in the absence of circumstances clearly showing that the testator so intended. The artificial relation created by adoption is an unusual and exceptional one, and hence would not fall within the ordinary signification of such terms. . . .."

Numerous other cases of comparable import are collected in the annotations commencing at 5 A. L. R. 1280 and 144 A. L. R. 670, 676, and 70 A. L. R. 621, 626. See, also, *Ross v. Bateman* (Tenn.), 291 S. W. (2d) 584 (1956); *In re Wehrhane's Estate*, 23 N. J. 205, 128 A. (2d) 681 (1957); 1 Am. Jur., Adoption of Children, 664, § 64; 57 Am. Jur., Wills, 768, § 1174; 95 C. J. S., Wills, 951, 954, §§ 652, 653, and Vol. V American Law of Property (1952), § 22.34.

RCW 11.12.230 requires that:

"All courts and others concerned in the execution of last wills shall have due regard to the direction of the will, and the true intent and meaning of the testator, in all matters brought before them."

■■ Our decisional law is to the same effect. *In re Johnson's Estate*, 46 Wn. (2d) 308, 280 P. (2d) 1034 (1955). We recently recognized this controlling principle in *In re Lee's Estate*, 49 Wn. (2d) 254, 299 P. (2d) 1066 (1956), wherein we said:

"A court is bound to give that construction to a will which will effectuate the intention of the testator if such intention

can be gathered from the terms of the will itself, and the intention is to be gathered from everything contained within the four corners of the instrument. . . . [Citations.] When a court is faced with two possible constructions one which will accomplish the evident ends sought by the testator and another of which will not, the former construction should be adopted if the language used will admit of such construction."

In addition to the provision of the will, above quoted, under which respondent Singerman claims, other pertinent provisions are:

"Thirdly:—I give and bequeath to my said daughter Ida May Black, my piano, and all household and kitchen furniture and household goods, of which I may die possessed, with the understanding that she shall give to my wife Mary A. E. Black, a proper home, as long as she shall remain my widow, and in case of her failure to do so, then said personal property shall be and become the property of said Mary A. E. Black.

"Fourthly:—I give, devise, and bequeath, all the rest, residue and remainder of my estate, both real and personal, community and separate, owned by me at the time of my death, to my wife Mary A. E. Black, my son Fountain Black, my daughter Sarah McDonald, my daughter Ann Young, my son Daniel Black, my son James Black, my son Charles Black, my daughter Ida May Black, my grandson Marion Black and my grandson John Black, to be divided equally between them, share and share alike.

"Fifthly:—I hereby nominate and appoint my son Daniel Black and my daughter Ida May Black, as the executor and the executrix of this my last will and testament, and I hereby direct that no bonds be required of them for the discharge of their duties as such executor and executrix."

■ We find nothing whatever in these sections to indicate an intention on the part of the testator that his granddaughter (respondent Singerman) should take, upon the termination of the life estate of Ida May Black, to the exclusion of the contingent remaindermen named in the will. On the contrary, we construe Henry Black's will as clearly showing an intention that, upon the death of Ida May, the property should pass to her lawful issue only, and, in de-

fault thereof, it was to pass to the four sons, three daughters, and two grandsons specifically named in the will.

The crucial question is *not* whether Mr. Black intended a stranger to the blood who might subsequently be adopted by Ida May to receive the property upon her death, but whether he intended respondent Lulu L. Singerman to receive it (in default of lawful issue of Ida May) to the exclusion of the nine heirs named in his will. It seems to us that the answer to this question must be in the negative for the following reasons:

1. Respondent was his nine-year-old granddaughter, with whom he was well acquainted. Her natural mother (who was a daughter of the testator) was named as one of nine contingent remaindermen. If respondent's mother had predeceased her, respondent would have succeeded to her mother's interest in the property. If the testator had intended that respondent inherit any direct or other interest in the property under any circumstances, he would have so provided in his will.

2. The testator specifically provided that two of his grandchildren (Marion Black and John Black) were to be included among the nine contingent remaindermen. If he had intended respondent or any other grandchild to be included in that class, he would have named her with the other heirs in the fourth paragraph of his will.

3. If Henry Black intended that Ida May should have the privilege of divesting the nine contingent remaindermen of their interest in the property (in default of her lawful issue) by substituting any other person, he would have given her a power of appointment for that purpose.

Even assuming that Henry Black is chargeable with knowledge of the statutory provisions relating to adoption, is it reasonable to believe that he thought for a moment that Ida May, who at the time of his death was a spinster of some thirty-five summers, would, just three weeks after entry of the decree of distribution in Mr. Black's estate, by adopting a granddaughter not named in his will, attempt to thwart his whole plan for the disposition of his entire real property upon her death? We cannot hold that Henry

Black had any such intention either when he made his will or when he died.

We think that the construction of Henry Black's will, for which respondent Singerman contends, would, under the stipulated facts of this case, frustrate, pervert, and utterly defeat the manifest intentions of the testator.

The decree is, therefore, reversed with instructions to enter a decree (consistent with the views herein expressed) granting appellants the relief prayed for in their complaint. In accordance with paragraph 19 of the stipulation of facts, the trial court shall fix the amount of attorney fees to be allowed appellants and shall proceed in conformity with the other pertinent provisions thereof. Appellants shall recover their costs in this court.

It is so ordered.

WEAVER, C. J., HILL, ROSELLINI, and FOSTER, JJ., concur.